Wynen agt. Schappert.

# N. Y. COMMON PLEAS.

## CHRISTIAN WYNEN agt. JOHN SCHAPPERT.

*Promissory note — notice of protest — when may be served by mail — what is good service by mail — who deemed holder for purpose of receiving and giving notice of protest — what is not unnecessary and unreasonable delay.*

When the indorser of note lives in a different place from that in which presentment or demand is to be made, personal service of notice of protest is not required, but the notice may be served on him by mail, although he lives in the same place with the holder who serves the notice.

Delivery to a city letter carrier of a notice of protest inclosed in an envelope, properly addressed and with postage prepaid, is good service by mail.

Where a note held in New York was payable in Kutztown, Pennsylvania, and the holder placed it in a New York bank for collection, which sent it to its Pennsylvania correspondent, a bank at Allentown, within eighteen miles of Kutztown, whence it was sent to a bank at Philadelphia, and thence to a bank at Reading, and thence to Kutztown for presentment, where it was dishonored:

*Held*, that each agent for transmission of the note for collection, having indorsed it, was the holder for the purpose of receiving and giving notice of protest; and that the return of such notices by the same channel, each bank forwarding them by the next mail, was not an unnecessary and unreasonable delay which discharged the first indorser.

*General Term, January*, 1878.

APPEAL·from judgment on verdict directed by court for the plaintiff against the defendant, as indorser of note for $10,000.

*Douglas Campbell,* for respondent.

*Martin L. Townsend,* for appellant.

DALY, *C. J.* — Where the indorser resides in a different place from that in which presentment or demand of the note is to be made, personal service of the notice of the dishonor of the note is not required, but notice may be served by mail (*Ransom* agt. *Mack*, 2 *Hill*, 590). Such was the case here. The notice was served by giving it to a United States letter carrier in this city, this city being the place where the indorser resides. This was a service by mail. It is provided by the laws of the United States (*U. S. Rev. Stat., p.* 759, *sec.* 3980) that every route agent, postal clerk or other carrier of the mail shall receive any mail matter presented to him and properly prepaid by postage stamps and deliver the same for mailing at the next post-office at which he arrives; and it is further provided that letter carriers shall be employed for the free delivery of mail matter in every place containing a population of 50,000 inhabitants (*sec.* 3865). It is claimed that a letter carrier, under this section, is not embraced by the term used in the other section "route agent, postal clerk or other carrier of the mail." The letter carriers are to be employed, by the express terms of the three thousand eight hundred and sixty-fifth section, for the free delivery of mail matter; and if a letter carrier is, under this section, to carry mail matter he is clearly embraced, by the words in the preceding section, "or other carrier of the mail." The word "mail," which with some changes in the orthography is found in many languages, means, in its original signification, a wallet, sack, budget, trunk or bag; and in connection with the post-office means the carriage of letters, whether applied to the bag into which they are put, the coach or vehicle by means of which they are transported, or any other means employed for their carriage and delivery by public authority. It came originally into use as referring to the valise which postillions or couriers had behind them and in which they carried letters at an early period when that was the mode in which letters were carried and delivered. And after the establishment of post-offices, post-routes and post-coaches it became, as it is now, a general

word to express the carriage and delivery of letters by public authority. The carrier in this case carried a bag having two compartments, in one of which letters to be delivered were put and in the other letters to be sent by mail, the kind of bag such officials were accustomed to carry, and the delivery to such a carrier of the notice of protest inclosed in an envelope properly addressed to the defendant with the postage prepaid was a service of the notice by mail. The remaining question is, whether there was due diligence in mailing the notice of protest to the defendant. The note was made payable at the Peabody Bank, Kutztown, Pennsylvania. The plaintiff placed it in the German Exchange Bank, in this city, for collection and they forwarded it to the Second National Bank of Allentown, Pennsylvania, which latter bank forwarded it to the National Bank of the Republic, in Philadelphia, Pennsylvania, by which bank it was forwarded to the Farmers' National Bank of Reading, Pennsylvania, and the latter bank forwarded it to the National Bank of Kutztown, Pennsylvania, being indorsed first by the cashier of the German Exchange Bank and by the cashiers of each of the banks through which it was successively transmitted to Kutztown for collection. It was presented by the National Bank of Kutztown to the Peabody Bank, at that place, where it was made payable and payment demanded which was refused, the answer being "no funds." It was then regularly protested by the notary of the bank and notices of protest were sent back in the same order in which the note had been transmitted, being regularly sent from bank to bank on the day of its receipt, or by the next mail, until it reached the German Exchange Bank, the clerk of which inclosed the notices of protest to the indorsers, to the plaintiff, by mail, who, as soon as he received the letter containing them, went to the indorser's (the defendant Schappert's) house to deliver the notice to him and discovered that he had moved, but could not learn where, and the plaintiff then went to Schappert's last place of business. Schappert had closed up his business on the fifteenth of July preceding, but the plain-

tiff learned that he was in the habit of stopping there to receive his letters every morning. The plaintiff then went to the German Exchange Bank upon the afternoon of the day he received the notice, or the next morning, but as he said to the best of his knowledge he believed it was the same afternoon and left directions to send the notice to the defendant's last place of business, and the notice was then immediately placed in an envelope, properly directed, the postage paid and was delivered in time for the next mail to the United States letter carrier who was in the habit of coming to the German Exchange Bank, which was on his route, to deliver and receive letters. The carrier had no recollection in respect to this particular letter, but testified that all letters so received by him were deposited by him at the United States station where he received letters to carry and where he deposited those that were sent by mail. The note was presented and protested on the 4th of September, 1876, and what time elapsed before the notices of protest were received by the German Exchange Bank in this city does not distinctly appear, but it was some time between four and seven days from the day the note was payable, and certainly within a week. The German Exchange Bank when they received the note for collection having no correspondent at Kutztown, nor any person there to whom they could send it, sent it, as they generally did with all their collections in Pennsylvania, to the bank at Allentown. As the discount clerk expressed it, they did so in accordance with their "usual custom of collection." Why the Bank of Allentown sent the note to the Bank of Philadelphia, that being a circuitous route to Kutztown, which was but eighteen miles from Allentown and which involved the transmission of the note through two additional banks, does not appear, but probably for the same reason as the German Exchange Bank, because they had no correspondent then at Kutztown, nor any person there to whom they could send it. The appellant claims that this was unnecessary and unreasonable, as it delayed the service of notices of protest on the defendant, in consequence of the transmission of the notices consecutively

to each preceding indorser, involving an incidental delay in the case of each indorser; but the presentation for payment, and the transmission of the proceeds of a note for the large amount of $10,000, was a very important business matter, and the Bank of Allentown would naturally send it to their own correspondent, a bank in which they could confide; and as nothing appears in the case but the fact that they sent it to the National Bank of the Republic at Philadelphia, I do not see that we must infer, in respect to a note of that large amount, that that was not proper because it was not the most direct route. Security and safety in the collection of so large an amount of money may, for all we know, have made it, as a matter of business experience and judgment, the most judicious course to send it to the bank at Philadelphia for collection at Kutztown. We cannot say judicially the bank at Allentown was bound to send it directly to Kutztown because it was only eighteen miles distant, and there was daily communication with it by mail and by railroad, whether the bank had any correspondent there or knew anyone there or not. Such matters are generally regulated by business connections; and if a note in its transmission from one place to another for collection is sent through a chain of banking institutions, it is probably because each one in the link is acquainted with the financial character of the other, and that the chain of connection is one of reciprocal credit and confidence. In a commercial matter like this, it is better for judicial tribunals to infer that banking institutions know what is the best way of conducting such a business, unless the court has facts before it from which it can see that the course pursued was clearly an improper one. The note having been transmitted through these several banks, the return of the notices of protest to the next immediate indorser, and so on through each preceding indorser, was right. It is claimed by the defendant that each of the banks through which the note passed for collection was the agent of the holder, and that he is responsible for a delay in the delivery of the notices of protest, arising from the fact of the unnecessary interposition of so many agents.

Wynen agt. Schappert.

Where a note, as in this case, is indorsed to a bank for collection at a distant place, that bank and the banks to which it is successively indorsed in the course of its transmission to the place where it is payable are, as respects the giving and receiving of notices of protest, regarded as the real holders of the note, so that when the note is dishonored, the proper course for the bank that presents it is to send the notices of protest to the next immediate indorser from whom they received the note, and for each indorser to do the same, although it may be a more circuitous route and involve more delay than to send notices from the place of presentation to each indorser (*Mead* agt. *Engs*, 5 *Cow.*, 303; *Ogden* agt. *Dobbin*, 2 *Hall*, 167; *Farmers' Bank of Bridgeport* agt. *Vail*, 21 *N. Y.*, 485; *Howard* agt. *Ives*, 1 *Hill*, 263; *Bank of the United States* agt. *Davis*, 2 *id.*, 457; *Colt* agt. *Noble*, 5 *Mass.*, 157; *Clade* agt. *Bayley*, 12 *Mees. & W.*, 51; *Scott* agt. *Lifford*, 9 *East*, 347). The appellant refers us to *In re Leeds Banking Company* (*Eng. Law Rep.*, 1 *Eq. C.*, 1) for the proposition that the respective banks through which a note was transmitted were the agents of the plaintiff, and that he is responsible for the delay resulting from the employment of four different agents to collect it. All, however, that was held in that case is, that where a bill, the drawer and acceptor of which had become bankrupts before the bill became due, was indorsed by a bank in Leeds to its correspondent in Liverpool, with the words payable in need at a bank in London, that the bank in London was by such an indorsement constituted an agent for the payment only, and not an agent for notice of dishonor generally; and that the notice of protest should have been sent to the indorser in Liverpool, and not, as it was, to the bank in London. There is nothing, therefore, in this decision in conflict with the rule as I have stated it; and if it were, it would be controlled by the authorities cited, by which the law in this state is well settled, as it is also in this country and in England. The notices of protest, therefore, in this case were sent in the proper way. Each of the banks through which they passed would, in a

Wynen agt. Schappert.

case like this, have exercised due diligence by sending notice the day following the one on which they received notice (*The Farmers' Bank of Bridgeport* agt. *Vail*, 21 *N. Y.*, 488), and the evidence is that each of them sent the notices within this time — in fact, by the next mail. Full effect is undoubtedly to be given to the rule, which had its origin in commercial usage, and was dictated by commercial necessity, that prompt and immediate notice should be given to an indorser of the dishonor of a bill; that in every case due diligence should be shown. But in applying such a rule at the present day, and determining, upon a given state of facts, whether due diligence has been exercised, it is to be considered that the ordinary mode of collecting a note, where it is payable in a different place from the holder's residence, is to deposit it for collection in a bank at the place where the holder lives, that it may be collected for him in a distant part of the country where the note is payable; banking institutions having particular facilities for that purpose, it being their custom to perform such a service gratuitously for the accommodation of their depositors or customers, and there being a greater security for a safe transmission of the money through their instrumentality to the holder than would be the case if he undertook to collect the note or bill himself. In performing such a service, they necessarily do so through the instrumentality of other banking institutions with whom they have established business connections, and who mutually co-operate and act for each other in forwarding the paper and seeing that it is duly presented at the time it is payable; and where there is, as in this case, nothing to question the good faith of the several banking institutions through whose hands this note passed in its transmission to Kutztown, that payment might be demanded, we are not to conclude because the note was not transmitted by the most direct route by mail or railroad, but by a circuitous one, that it was improper to do so, and unreasonably caused delay.

The judgment, therefore, in my opinion, should be affirmed.
VAN HOESEN and LARREMORE, JJ., concurred.